715 F.2d 581
 230 U.S.App.D.C. 107
 WATER TRANSPORT ASSOCIATION, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
CSX Corporation and Texas Gas Resources Corporation, Eastern
Coal Transportation Conference, Intervenors.
 No. 83-1737.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued July 20, 1983.
Decided Aug. 4, 1983.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 Richard A. Zeller, Oneida, N.Y., with whom Neil K. Evans, Cleveland, Ohio, Alan M. Wiseman, James R. Fox, and Robert F. Ruyak, Washington, D.C., were on brief, for petitioners.
 
 
 1
 Ernest Abbott, Atty., I.C.C., Washington, D.C., with whom John Broadley, Gen. Counsel, and Ellen D. Hanson, Associate Gen. Counsel, I.C.C., Washington, D.C., were on brief, for respondent, I.C.C. Henri F. Rush and Edward J. O'Meara, Attys., I.C.C., Washington, D.C., also entered appearances for respondent, I.C.C.
 
 
 2
 John J. Powers, III, Atty., Dept. of Justice, Washington, D.C., entered an appearance for respondent, U.S.
 
 
 3
 Peter J. Nickles, Washington, D.C., with whom Eugene D. Gulland and Ellen Bass, Washington, D.C., were on brief, for intervenors, CSX Corp., et al.
 
 
 4
 William L. Slover, C. Michael Loftus, and Donald G. Avery, Washington, D.C., were on brief for intervenor, Eastern Coal Transp. Conference.
 
 
 5
 [230 U.S.App.D.C. 108] Before WALD and SCALIA, Circuit Judges, and HAROLD H. GREENE,* District Judge for the District of Columbia.
 
 
 6
 Opinion for the Court filed by Circuit Judge WALD.
 
 
 7
 Dissenting opinion filed by District Judge HAROLD H. GREENE.
 
 WALD, Circuit Judge:
 
 8
 CSX Corp. (which operates a railroad) agreed to acquire by tender offer Texas Gas Resources Corp. (Texas Gas), which in turn owns American Commercial Barge Lines, Inc. (which operates a barge line). Water Transport Association (WTA), an organization of barge operators, asked the Interstate Commerce Commission (ICC or Commission) to declare that the tender offer violates the Panama Canal Act, 49 U.S.C. § 11,321. WTA argued that § 11,321(a)(1) makes it unlawful for a railroad to "own, operate, control, or have an interest in" a competing water carrier unless the Commission has approved the transaction after a full hearing, and that no hearing had been held. The ICC held that the tender offer did not violate the Canal Act because CSX and Texas Gas had agreed to put the barge line stock into an independent voting trust until the ICC held a hearing and approved or disapproved the transaction. WTA appeals the ICC's decision.
 
 
 9
 We affirm the ICC's decision, though not all of the Commission's broad language. We hold that the ICC, as an incident to its authority under § 11,321 to approve the acquisition after hearing, may authorize CSX to proceed with the tender offer if CSX agrees to hold the barge line in a temporary ICC-approved independent voting trust until a hearing can be held.
 
 I. BACKGROUND
 A. Statutory Scheme
 
 10
 Two sections of the Interstate Commerce Act restrict a railroad's power to acquire a water carrier. One, 49 U.S.C. § 11,343, deals generally with one carrier acquiring another carrier; the other, id. § 11,321, is specifically concerned with a rail carrier acquiring a water carrier.
 
 
 11
 1. Provisions Governing Merger of Two Carriers
 
 
 12
 49 U.S.C. § 11,343(a) requires advance ICC approval before one carrier can merge with or otherwise acquire control of another carrier:
 
 
 13
 The following transactions ... may be carried out only with the approval and authorization of the Commission:
 
 
 14
 (1) consolidation or merger ... of at least 2 carriers into one corporation ....
 
 
 15
 ....
 
 
 16
 (3) acquisition of control of a carrier by any number of carriers.
 
 
 17
 (4) acquisition of control of at least 2 carriers by a person that is not a carrier.
 
 
 18
 (5) acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers.
 
 
 19
 The ICC "shall approve" the transaction if it finds the transaction is "consistent with the public interest." Id. § 11,344(c). Before giving its approval, the ICC must conduct a full evidentiary hearing, which can take several years for a merger of two large railroads, see id. § 11,345(b), and 10 months for other transactions of "regional or national transportation significance," see id. § 11,345(c).
 
 
 20
 Because of this long delay, merging carriers often have an economic incentive to complete the transaction first and seek ICC approval later. The ICC has long permitted carriers to do this by use of an independent voting trust. If the acquiring carriers put the stock of the acquired carriers in an independent voting trust, the ICC holds that the transaction does not violate § 11,343 because the acquiring carrier does not "control" the acquired carrier. See Voting Trust Rules, 49 C.F.R. § 1013 (1982). This construction of § 11,343 has been upheld by the courts[1] and is not disputed here.
 
 
 21
 [230 U.S.App.D.C. 109] 2. The Panama Canal Act
 
 
 22
 The second relevant provision of the Interstate Commerce Act, and the principal focus of this case, is 49 U.S.C. § 11,321, which derives from § 11 of the Panama Canal Act of 1912.[2] Congress specifically designed the Canal Act to protect independent water carriers from unfair competition by rail-owned water carriers. As presently codified, it forbids a rail carrier to "own, operate, control, or have an interest in" a competing water carrier unless the ICC finds that the ownership, control, or interest will not be contrary to the "public interest" and will not reduce water competition:
 
 
 23
 (a)(1) Notwithstanding [§ 11,343], a [rail] carrier ... may not own, operate, control, or have an interest in a water carrier ... with which it does or may compete for traffic.
 
 
 24
 ....
 
 
 25
 (b) Notwithstanding subsection (a) of this section, the Commission may authorize a [rail] carrier ... to own, operate, control or have an interest in a water common carrier ... when the Commission finds that ownership, operation, control, or interest will still allow that water common carrier ... to be operated in the public interest ... and that it will still allow competition, without reduction, on the water route in question.
 
 
 26
 Section 11,321(a)(2) gives the Commission authority to determine whether a rail carrier "does or may compete" with a water carrier:
 
 
 27
 The Commission may decide ... questions of fact related to competition or the possibility of competition under this subsection on application of a carrier.... The Commission may begin a proceeding under this subsection on its own initiative or on application of a shipper ... if the carrier has not applied to the Commission and had the question of competition or the possibility of competition determined ....
 
 
 28
 Any Commission action, whether a finding of fact on competition under subsection (a)(2), or approval of ownership, control, or interest despite the existence of competition under subsection (b), may be taken "only after a full hearing." Id. § 11,321(c).
 
 
 29
 Cases where a rail carrier has sought to acquire a competing water carrier have been few and far between. As a result, the ICC had no occasion before this case to consider whether, as under § 11,343, a railroad can use an independent voting trust to acquire a water carrier before the ICC has had time to conduct a hearing and give or withhold its approval.[3]
 
 B. The CSX Tender Offer
 
 30
 Texas Gas is a public corporation whose primary business is running a natural gas pipeline system. American Commercial Barge Lines, a wholly-owned subsidiary of Texas Gas, is an ICC-regulated water carrier that operates a barge line east of the Mississippi. Its operations represent about 10% of Texas Gas revenues.
 
 
 31
 [230 U.S.App.D.C. 110] On June 6, 1983, Coastal Corp. made a hostile tender offer for 51% of Texas Gas' stock at $45 per share. Texas Gas looked for a "white knight" to make a friendly tender offer at a higher price and on June 9 found CSX Corp., which agreed to purchase 100% of Texas Gas' stock at $52 per share. CSX's primary business is operating a large railroad east of the Mississippi. The railroad is, of course, regulated by the ICC.
 
 
 32
 Texas Gas and CSX recognized that the merger of CSX with Texas Gas' barge line subsidiary required ICC approval under 49 U.S.C. § 11,343 (requiring ICC approval before one carrier can acquire another) and might require approval under id. § 11,321 (requiring ICC approval for a rail carrier to own a competing water carrier). They therefore agreed to place the barge line stock in an independent voting trust pursuant to ICC voting trust guidelines established under § 11,343. See 49 C.F.R. § 1013 (1982).
 
 
 33
 The voting trust was irrevocable and instructed the trustee, Midlantic National Bank, not to "create any dependence or intercorporate relationship" between CSX and American Commercial Barge Lines, nor to vote the trust stock "to elect any ... representative of Texas Gas, CSX or their affiliates as an officer or director of the [barge line]."[4] CSX committed to apply to the ICC for authority to control American Commercial Barge Lines "as soon as practicable."[5] CSX hoped that the voting trust would allow the overall CSX-Texas Gas merger to go forward while the ICC was considering whether to approve CSX's application to acquire the barge line subsidiary.
 
 
 34
 The ICC staff reviewed the voting trust agreement and requested various changes, including an instruction to the trustee to sell the barge line if the ICC disapproves the merger.[6] After CSX and Texas Gas made the changes, the ICC staff issued its "informal nonbinding Commission opinion" that the trust "does effectively insulate ... CSX from violation of the Commission's policy against an unauthorized acquisition of control of a regulated carrier."[7] The ICC staff opinion did not discuss whether the voting trust also insulated CSX from having an unlawful "interest" in American Commercial Barge Lines under § 11,321.
 
 C. Proceedings Before the ICC
 
 35
 On June 23, 1983, WTA petitioned the ICC for a declaration that the voting trust, even if it satisfied § 11,343's command that one carrier not control another without prior ICC approval, did not satisfy § 11,321's requirement that a rail carrier not hold any "interest" in a water carrier without prior ICC approval.[8] The Association also asked [230 U.S.App.D.C. 111] the ICC to take appropriate steps to prevent the merger from going forward.[9]
 
 
 36
 On June 29, the ICC denied WTA's request. The Commission did not address the factual question whether CSX "does or may compete" with American Commercial Barge Lines. Nor did the Commission discuss whether § 11,321 requires a rail carrier to obtain Commission approval before acquiring a non-controlling "interest" in a water carrier, as opposed to first acquiring the interest and then seeking Commission approval (§ 11,343 would in any event require advance ICC approval before the rail carrier could control the water carrier). Rather, it held that a temporary independent voting trust, designed to insulate a water carrier from control by a rail carrier pending an ICC decision whether the merger may proceed, is not prohibited by § 11,321. Water Transport Association--Petition for Declaratory Order--American Commercial Lines Voting Trust, Finance Docket No. 30,215, at 9 (July 1, 1983) [hereinafter cited as ICC Decision ].
 
 
 37
 After reviewing the legislative history, the ICC found that the Panama Canal Act was intended "to prohibit [rail-water] relationships with possible adverse impacts on competition." Id. at 7. The temporary voting trust was consistent with this purpose because it reasonably insulated the barge line from CSX control, and thus prevented significant harm to water competition during the limited period the trust remained in effect. The Commission explained:
 
 
 38
 [A]n independent voting trust of the type entered into here is merely a temporary device designed to avoid a technical violation of the law in the context of a corporate acquisition. It is not, and cannot, be a device for holding stock on a permanent basis. This fact alone largely prevents the voting trust device from becoming a tool for altering rail-water competitive relationships.
 
 
 39
 Id. at 9.
 
 
 40
 Moreover, if CSX were to attempt to influence barge operations notwithstanding the trust, the ICC could act at that time; an injunction was not needed to prevent "speculative future violations." Id. at 8. Finally, to the extent the statute was ambiguous, policy considerations favored an interpretation that would "avoid interference in the workings of the marketplace." Id. at 1.[10]
 
 D. Proceedings Before this Court
 
 41
 Under the securities laws governing tender offers, CSX could begin to purchase tendered Texas Gas shares at midnight, June 29, 1983, the same day that the ICC [230 U.S.App.D.C. 112] issued its decision. WTA sought and obtained a temporary restraining order from the district court forbidding CSX to purchase any Texas Gas shares for ten days, to give WTA time to appeal the ICC's decision to this court. A motions panel of this court continued the stay pending our review of the merits.[11] In view of the stay, and the power of Texas Gas shareholders to withdraw their tendered shares from the CSX offer after August 7, we ordered expedited briefing and argument.
 
 E. Issue Presented
 
 42
 WTA, supported by intervenor Eastern Coal Transportation Conference (an association of coal producers), raises again the question of statutory construction it raised before the ICC: Can a rail carrier acquire a water carrier prior to the full hearing required by § 11,321 if it places the water carrier stock in a temporary ICC-approved independent voting trust pending the § 11,321 hearing? WTA concedes that the voting trust prevents CSX from controlling American Commercial Barge Lines. It argues, however, that CSX still has a financial interest in the barge line that, absent ICC approval after full hearing, is within § 11,321(a)(1)'s ban on a railroad's owning, operating, controlling, or having an "interest" in a competing water carrier.[12]
 
 
 43
 The ICC, supported by intervenors CSX and Texas Gas, argues that it reasonably interpreted an ambiguous statute to comport with modern business conditions. The Commission emphasizes that CSX agreed to acquire Texas Gas under the threat of a hostile tender offer by Coastal Corp., and the acquisition must be completed quickly if at all. For the Commission to hold a full hearing before approving the voting trust would, as a practical matter, kill the deal, thus depriving CSX of its right to a hearing under § 11,321(a)(2) and § 11,321(b) on whether it competes with American Commercial Barge Lines and if so, whether the purchase nevertheless is in the public interest.
 
 
 44
 The United States Department of Justice, named as a respondent, neither supports nor opposes the ICC's position nor explains its own view of § 11,321.
 
 
 45
 II. THE VALIDITY OF A TEMPORARY INDEPENDENT VOTING TRUST
 
 A. History and Purpose of § 11,321
 
 46
 To determine whether the ICC's construction is consistent with congressional intent, we must review the Panama Canal Act's adoption and its subsequent interpretation by the ICC and amendment by Congress.
 
 1. The Original Panama Canal Act
 
 47
 Prior to 1912, the Interstate Commerce Act did not restrict the merger of two carriers, nor did the ICC regulate water [230 U.S.App.D.C. 113] carriers. The railroads used this freedom to engage in a variety of schemes to drive competing water carriers out of business. One popular tactic was to buy a water carrier, price its service so low that other water carriers were forced to close down, and then raise prices again.[13]
 
 
 48
 In 1912, in § 11 of the Panama Canal Act, Congress acted to preserve rail-water competition by barring railroads from owning or controlling competing water carriers:
 
 
 49
 [After July 1, 1914], it shall be unlawful for any railroad company ... to own, lease, operate, control, or have any interest whatsoever (by stock ownership or otherwise, either directly, indirectly, through any holding company, or by stockholders or directors in common, or in any other manner) in any common carrier by water ... with which said railroad ... does or may compete ....
 
 
 50
 Congress gave the ICC jurisdiction to decide the factual question whether actual or potential competition existed:
 
 
 51
 Jurisdiction is hereby conferred on the Interstate Commerce Commission to determine questions of fact as to the competition or possibility of competition, after full hearing, on the application of any railroad company or other carrier. Such application may be filed for the purpose of determining whether any existing service is in violation of this section ... or for the purpose of asking an order to install new service not in conflict with the provisions of this paragraph. The commission may on its own motion ... inquire into the operation of any vessel in use by any railroad ... which has not applied to the commission and had the question of competition ... determined as herein provided.
 
 
 52
 Finally, Congress included a grandfather provision permitting railroads that already owned barge lines to continue to do so if continued ownership was in the public interest and water competition would not be reduced thereby:
 
 
 53
 If the Interstate Commerce Commission shall be of the opinion that any such existing specified service by water ... is being operated in the interest of the public and ... that such extension will neither exclude, prevent, nor reduce competition on the route by water under consideration, the Interstate Commerce Commission may, by order, extend the time during which such service by water may continue to be operated beyond July [1, 1914].
 
 
 54
 There is no firm evidence, either in the statutory text or the legislative history, that Congress focused on the question of when --before or after the acquisition--the ICC would determine the existence or absence of competition in the event a rail carrier proposed to buy a water carrier. The second paragraph of the statute (quoted above) contemplates an application with regard to "existing service," which suggests the possibility of acquiring first and applying for ICC approval later. On the other hand, this language may refer only to service existing at the time the Act was passed. It is likely that Congress gave little thought to new acquisition (though it clearly contemplated new service by existing carriers); its primary focus was on providing for divestiture where past mergers had reduced competition.[14]
 
 
 55
 There was also no significant discussion of what the term "interest" might mean. The debate proceeded almost entirely in terms of the pros and cons of railroad "ownership" [230 U.S.App.D.C. 114] or "control" of water carriers.[15] It seemed to be agreed that a railroad could own neither all nor part of the stock of a competing water carrier.[16] But the one attempt in the debate to delineate what other relationships might be permitted ended inconclusively with the sponsor of the railroad provision urging the representative who had pointed out an ambiguity (concerning the same stockholders owning shares in both a railroad and a water carrier) to "give that careful study and correct it if he can."[17]
 
 2. The Transportation Act of 1920
 
 56
 In 1920, Congress gave the ICC authority to regulate carrier mergers generally. The Transportation Act of 1920, ch. 91, sec. 407, § 5(2), 41 Stat. 456, 481 (current version at 49 U.S.C. § 11,343), provided that the ICC could approve mergers that "will be in the public interest":
 
 
 57
 Whenever the Commission is of opinion, after hearing, upon application of any carrier ... that the acquisition ... of the control of any other such carrier or carriers either under a lease or by the purchase of stock or in any other manner ... will be in the public interest, the Commission shall have authority by order to approve and authorize such acquisition ....
 
 
 58
 Congress did not change the Panama Canal Act, merely renumbering its three paragraphs as §§ 5(9)-(11) of the revised § 5 of the Interstate Commerce Act.
 
 
 59
 3. Early ICC Interpretation of the Panama Canal Act
 
 
 60
 The Interstate Commerce Commission, during the 1920s and 1930s, gave the Panama Canal Act a liberal interpretation that the 1912 Congress may not have contemplated. The ICC's interpretation is important because it was endorsed by a later Congress.
 
 
 61
 In Southern Pacific Company's Ownership of Atlantic Steamship Lines, 77 I.C.C. 124 (1923), the ICC found that Southern Pacific's proposed new water service would compete with Southern Pacific's rail lines, id. at 137, but nevertheless approved the new service. The Commission construed the Canal Act to permit new service under the same standard that governed continuance of existing service--whether the new service would be in the public interest and would not reduce water competition. Id. at 128-29. The Commission explained:
 
 
 62
 The purpose of the Panama Canal amendment ... was not to forbid railroad ownership, operation, or control of steamship lines, but to forbid the use of such ownership [230 U.S.App.D.C. 115] or control in such a manner as to restrict movement of interstate commerce....
 
 
 63
 Id. at 137.
 
 
 64
 Investigation of Seatrain Lines, Inc., 206 I.C.C. 328 (1935), extended the Southern Pacific holding to railroad investment in new water carriers as well as new service by existing rail-owned water carriers. Seatrain, 15% owned by two railroads, was formed in 1932 to carry railcars by boat up and down the Eastern seaboard. At roughly the same time, the railroads applied to the Commission to determine whether their stock holding violated the Panama Canal Act. The Commission found that the railroads' minority ownership of Seatrain fell within the Canal Act's prohibition of "any interest whatsoever" and that the new company competed with the two railroads. Id. at 333, 335. Nevertheless, the Commission approved continued stock ownership by the railroads because Seatrain's service was in the public interest and would not reduce water competition. Id. at 335-36. Significantly, the Commission did not suggest that it was improper for the railroads to acquire an interest in a competing water carrier first and ask the Commission's approval later.
 
 4. The Transportation Act of 1940
 
 65
 Against this background, Congress in 1940 enacted major amendments to the Interstate Commerce Act.[18] Economic times had changed and the railroads were in poor financial shape and were beset by strong competition from unregulated water carriers. At the railroads' urging, Congress brought water carriers under ICC control with the purpose, among other things, of protecting railroads against unrestrained water carrier competition.[19]
 
 
 66
 Congress also amended the Panama Canal Act with the specific purpose of endorsing the ICC's interpretation of the Canal Act, in the Southern Pacific and Seatrain Lines cases, to permit railroad acquisitions of water carriers that were in the public interest and would not reduce competition.[20] The Canal Act (codified at 49 U.S.C. § 5(14)-(16)) now provided (significant changes italicized):
 
 
 67
 (14) Notwithstanding [the predecessor to § 11,343], from and after [July 1, 1914], it shall be unlawful for any [rail] carrier ... to own, lease, operate, control, or have any interest whatsoever (by stock ownership or otherwise, either directly, indirectly, through any holding company, or by stockholders or directors in common, or in any other manner) in any common carrier by water ... with which such carrier aforesaid does or may compete ....
 
 
 68
 (15) Jurisdiction is hereby conferred on the Commission to determine questions of fact ... as to the competition or possibility of competition, after full hearing, on the application of any railroad company or other carrier. Such application may be filed for the purpose of determining whether any existing service is in violation [230 U.S.App.D.C. 116] of [§ 5(14) ] ... or may pray for an order under the provisions of [§ 5(16) ]. The Commission may on its own motion ... inquire into the operation of any vessel in use by any railroad ... which has not applied to the Commission and had the question of competition ... determined as herein provided ....
 
 
 69
 (16) Notwithstanding the provisions of [§ 5(14) ] the Commission shall have authority ... to authorize [a rail] carrier to own or acquire ownership of, to lease or operate, to have or acquire control of, or to have or acquire an interest in, a common carrier by water ... if the Commission shall find that the continuance or acquisition ... will not prevent such common carrier by water ... from being operated in the interest of the public ... and that it will not exclude, prevent, or reduce competition on the route by water under consideration ....
 
 
 70
 Congress clearly expected rail carriers to be able, with ICC approval, to acquire competing water carriers. However, the congressional debate again failed to focus on when--before or after the acquisition took place--the ICC would determine whether competition existed under § 5(15) or if the acquisition was in the public interest under § 5(16). The language of § 5(16) does, however, seem to contemplate both advance inquiry by a railroad that wants to acquire a Commission review of an existing arrangement if the railroad buys first and asks permission later.[21]
 
 
 71
 If Congress did not consider the timing of the ICC's inquiry, far less did it consider the subtler question whether an advance approval requirement, coupled with § 5(14)'s ban on "any interest whatsoever," would interdict financial arrangements that a rail carrier and a water carrier might want to or need to make pending ICC review of a merger.
 
 
 72
 Congress has not amended the Panama Canal Act since 1940. The differences between the current version in § 11,321 (quoted in part I.A supra ) and the 1940 version arise from a 1978 recodification of the Interstate Commerce Act that was intended to be "without substantive change." 49 U.S.C. note preceding § 10,101. Congress has, however, substantially deregulated the railroad industry (notably rate-setting practices) in the Railroad Revitalization and Regulatory Reform Act of 1976[22] and the Staggers Rail Act of 1980.[23] The Staggers Act, moreover, establishes "the policy of the United States ... to minimize the need for Federal regulatory control over the rail transportation system." 49 U.S.C. § 10,101a(2).[24][230 U.S.App.D.C. 117] B. ICC Cases Involving Water Carrier Acquisitions
 
 
 73
 Only five reported ICC decisions in the 43 years since the 1940 revision of the Panama Canal Act involve railroad acquisition of a water carrier. Of these, only two are directly relevant. Both involved purchase contracts contingent on ICC approval. In Illinois Central Railroad--Control--John I. Hay Co., 317 I.C.C. 39 (1962), Illinois Central agreed to purchase John Hay for $9,000,000 plus earnings from date of agreement to date of closing, less any dividends paid. Id. at 62 (hearing examiner's report). John Hay promised to continue its business without substantial change until closing, agreed not to enter into contracts with other carriers unless required to do so by law, and agreed to various other conditions. Id. at 63. This binding purchase contract obviously gave Illinois Central a substantial stake in John Hay's future profitability and concomitant incentive to steer traffic to John Hay from competing water carriers. It also gave Illinois Central the power, through enforcing the provisions of the contract, to restrict John Hay's freedom to engage in the full range of corporate activities. Nevertheless, no one suggested that Illinois Central, by signing the purchase contract, had illegally acquired an "interest" in the barge line within the meaning of § 5(14)'s prohibition on "any interest whatsoever." The Commission considered on the merits and disapproved the proposed takeover. Id. at 53-54.
 
 
 74
 Similarly, in Chicago, Milwaukee, St. Paul & Pacific Railroad Control, Bremerton Freight Car Ferry, Inc., 312 I.C.C. 553 (1961), Bremerton Ferry agreed to sell its business for $105,000, to incur no obligations except in the usual course of business until closing, and to maintain its physical properties in substantially as good condition as they were in at time of agreement. Id. at 556. Once again, no one questioned whether the railroad had acquired a forbidden "interest" in the water carrier. This time, the ICC approved the transaction on the grounds that the two carriers did not compete. Id. at 557.[25]
 
 
 75
 C. Is This Voting Trust an "Interest"?
 
 1. Standard of Review
 
 76
 We preface our analysis by noting the limited scope of our review. As a general rule, courts must give "great deference to the interpretation given the statute by the officers or agency charged with its administration." [230 U.S.App.D.C. 118] EPA v. National Crushed Stone Association, 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980) (citation and footnote omitted); see National Wildlife Federation v. Gorsuch, 693 F.2d 156, 166-67 (D.C.Cir.1982).[26] Of course, if the ICC's interpretation is "inconsistent with the language of the [Canal Act], as interpreted in light of the legislative history, or if it 'frustrate[s] the policy that Congress sought to implement,' no amount of deference can save it." National Wildlife Federation, 693 F.2d at 171 (quoting Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981)). However, we should not lightly assume that the plain language of the statute forecloses the Commission's interpretation, for, in Learned Hand's words, "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary, but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945) (quoted in Watt v. Alaska, 451 U.S. 259, 266 n. 9, 101 S.Ct. 1673, 1678 n. 9, 68 L.Ed.2d 80 (1981)).
 
 
 77
 If the statutory language and legislative purpose permit the agency's construction, that construction "must be upheld if it is 'sufficiently reasonable,' even if it is not 'the only reasonable one or even the reading the court would have reached' on its own." National Wildlife Federation, 693 F.2d at 171 (quoting FEC v. Democratic Senatorial Campaign Committee, 454 U.S. at 39, 102 S.Ct. at 46).
 
 
 78
 2. The Short Step From Purchase Contract to Voting Trust
 
 
 79
 The John Hay and Bremerton Ferry cases can be taken to implicitly hold that a purchase contract contingent on ICC approval is not an "interest" in a water carrier within the meaning of the Canal Act. Moreover, the ICC could not reasonably have held otherwise. A railroad and a water carrier are unlikely to embark on the long and costly process of seeking ICC approval without a definitive merger agreement. Such an agreement, however, necessarily gives the acquiring railroad a stake in the future earning power of its prospective partner. One could reasonably call this stake, even though it is contingent on ICC approval, an "interest" in the water carrier. See Black's Law Dictionary 729 (5th ed. 1979) ("Interest. The most general term that can be employed to denote a right, claim, title, or legal share in something."). Nevertheless, such a right or claim must be permissible because Congress contemplated that railroads could acquire water carriers.
 
 
 80
 Thus, unless, contrary to the Commission's interpretation, the statute does not require advance approval of acquisitions,[27] we are forced to conclude that the statutory phrase "any interest whatsoever" cannot be taken literally.[28] Moreover, the legislative [230 U.S.App.D.C. 119] history is of scant help in deciding which interests are permitted and which forbidden. Congress expressly considered neither the scope of the term "interest" nor the tension between a literal reading of the term and the express authorization in § 11,321(b) for rail-water mergers.
 
 
 81
 To decide which interests are permitted, we must refer to the basic Canal Act policy to preserve rail-water competition and thus consider the ability and incentive of the railroad to influence the water carrier or water competition and the ability and incentive of the water carrier to compete with the rail carrier.
 
 
 82
 If it be conceded--and WTA concedes it--that a purchase contract contingent upon ICC approval of the underlying transaction is not an "interest" within the meaning of § 11,321(a)(1),[29] it is but a short step to hold that the temporary ICC-approved independent voting trust used by CSX is not an "interest" either.[30] The purchase contracts in John Hay and Bremerton Ferry and the voting trust in the present case share two critical features. Both are strictly limited in time duration and both insulate the water carrier from railroad control pending a full ICC hearing.
 
 
 83
 Either way the rail carrier has some incentive to influence the water carrier's operations because the rail carrier may reap the benefit of the water carrier's future profitability. But in both cases, the incentive is diluted because the ICC may disapprove the transaction, thus eliminating any anticipated future profits.[31] In addition, [230 U.S.App.D.C. 120] the potential for influence is limited by the short duration of the purchase contract or voting trust. Moreover, the rail carrier lacks the control over the water carrier needed to embark on major anticompetitive actions such as predatory pricing.[32]
 
 
 84
 As for the water carrier, it may lack an incentive to compete vigorously with its potential future master. But again, this possible lack of incentive would exist no matter how the deal is structured. Moreover, the water carrier has greater ability to compete with full managerial authority vested in an independent trustee than with management's hands tied by a restrictive purchase contract. Cf. Lamoille Valley Railroad v. ICC, 711 F.2d 295 at 330-31 (D.C.Cir.1983) (finding it a close question whether a purchase contract gave one railroad premature control over another railroad).
 
 
 85
 Moreover, the ICC's interpretation is consistent with the dual purpose of the Canal Act to permit some rail-water mergers while preserving vigorous water competition and with the congressional policy, stated in the Staggers Act, "to minimize the need for Federal regulatory control over the rail transportation system." 49 U.S.C. § 10,101(a)(2). An ICC ruling that a voting trust violates the Canal Act would foreclose the common acquisition device of the tender offer. This would force railroads to use less desirable alternative means if they could, and foreclose acquisition entirely if it could not be made by purchase contract (a likely consequence in this case because of the competing tender offer from Coastal Corp.). In addition, such a ruling might, as in this case, disrupt a much larger merger of which the water carrier acquisition is only a small part. The Canal Act purpose to permit the ICC to approve rail-water mergers that are in the public interest would be frustrated, at minimal gain in preventing anticompetitive railroad practices.
 
 D. The ICC's Enforcement Discretion
 
 86
 Even if the present voting trust violated the Panama Canal Act, we would be unable to award WTA the relief which it seeks. The dissent is doubtless correct when it states, see dissenting op. at 603 n. 33, that the Commission has no discretion not to enforce the Panama Canal Act prohibition--and cases such as Adams v. Richardson, 480 F.2d 1159 (D.C.Cir.1973), adequately support that proposition. The present case, however, is two steps short of that situation. First, the Commission is not saying that it will not enforce the prohibition against all violations, or even against all violations involving a voting trust, but only against this particular voting trust. No case we are aware of supports the unlikely proposition that an agency must proceed against every single violator--and indeed Moog Industries v. FTC, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958), holds precisely the contrary.
 
 
 87
 Second, in denying WTA's petition (and still assuming that the present voting trust is a violation) the Commission would not even be saying that it declines to enforce the Act's prohibition against this particular violation--but only that it declines to enforce it through the particular means that WTA seeks, namely, the extreme remedy of an injunction. The Commission could have explored other remedies, such as a daily fine for violation or an order to sell the [230 U.S.App.D.C. 121] barge line or spin it off to shareholders either promptly after completing the tender offer or after a full hearing. The Commission's choice among these options would presumably depend largely on its assessment of the likelihood that it would permit the merger after full hearing (either because the two carriers do not compete or because the merger is in the public interest) and of the injury to competition in the interim. The Commission's weighing of these factors and its consequent exercise of its enforcement discretion, if reviewable at all,[33] would be reviewable only under the arbitrary and capricious standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). We do not see how, in the application of such a test, the dissent can conclude that the Commission had no choice except to select the remedy of injunction. That is especially so since one of the central considerations governing that choice, "the adverse effect on competition that might result from [a particular enforcement strategy]" is "clearly within the special competence of" and "call[s] for the discretionary determination by" the agency. Moog Industries v. FTC, supra, 355 U.S. at 413, 78 S.Ct. at 379.
 
 
 88
 Even assuming, then, the correctness of the dissent's position on the meaning of the statute, the outcome would not be what the dissent proposes, an order requiring the Commission to seek injunctive relief; but at most a remand for the somewhat quixotic purpose of enabling the Commission to decide whether it wishes to seek that extreme remedy against an arrangement which it has found to be essentially harmless.
 
 III. CONCLUSION
 
 89
 In sum, we think, in the circumstances of this case, that the ICC has given its governing statute a reasonable interpretation. We affirm the ICC's decision that the Panama Canal Act, 49 U.S.C. § 11,321, permits a rail carrier to acquire water carrier stock without prior hearing if it puts the stock into an ICC-approved independent voting trust for the minimum period needed to secure a full hearing on whether the Canal Act permits the stock ownership.[34]
 
 
 90
 We lift the stay effective 24 hours from the date of this decision; the mandate will issue at the usual time.
 
 HAROLD H. GREENE, District Judge, dissenting:
 
 91
 The Panama Canal Act provides that a rail carrier "may not ... have an interest in a water common carrier ... with which it does or may compete for traffic." 49 U.S.C. § 11321(a)(1). A railroad may escape that prohibition only if the Interstate Commerce Commission finds that such interest as the carrier intends to acquire "will still allow competition, without reduction, on the water route in question."[1] 49 U.S.C. [230 U.S.App.D.C. 122] § 11321(b). However, even so, "[t]he Commission may take action under this section only after a full hearing." 49 U.S.C. § 11321(c).
 
 
 92
 CSX Corporation, the third largest railroad in the United States,[2] seeks to acquire Texas Gas Resources Corporation, one of whose fully-owned subsidiaries is American Commercial Lines, Inc. (ACL) which operates American Commercial Barge Lines, Inc. (ACBL), the largest water carrier engaged in operations on the inland waterway system of the United States. This, then, is by any measure a massive takeover of a water carrier by a railroad. Since the merger required ICC approval, CSX and Texas Gas established a voting trust arrangement whereby CSX would own the acquired shares of ACL but a bank trustee would exercise voting power. The ICC ruled that, in view of the establishment of the voting trust, CSX was not acquiring an "interest" within the meaning of the statutory prohibition, and it permitted the acquisition to go forward. The Court affirms the Commission decision, albeit on a different rationale. I dissent.
 
 
 93
 * There is a long history in this country of attempts by railroads to acquire surface freight transport domination by attempting to drive water carriers out of business. Water transportation being the cheaper mode, rail carriers typically sought to overcome their economic disadvantage by buying water carriers, lowering prices to levels at which competing water carriers were forced out of business, and then raising the prices charged by the remaining water carriers, so as to eliminate any differential between water and rail rates.[3] The Panama Canal Act is aimed directly at these aggressive actions.[4]
 
 
 94
 The flat prohibition[5] on railroad takeovers in section 11321 is an expression of this congressional concern. The escape provision codified in subsection (b) was added in 1940 to provide relief where it could be demonstrated that competition would not be harmed and that the joint rail-water operation would be in the public interest. Transportation Act of 1940, Pub.L. No. 76-785, 54 Stat. 898, 909-10. However, as noted, Congress also specified that such a determination was to be made only after a hearing.
 
 
 95
 The Commission's construction of the statute in this case stands this fairly straightforward statutory scheme on its head. Instead of making its determination regarding the appropriateness of the acquisition within the framework of the prior hearing required by subsection (c),[6] the ICC [230 U.S.App.D.C. 123] transfers the decision-making process to subsection (a) by the simple device of determining at the very outset of its consideration that a voting trust is not an "interest" within the meaning of the Act. The hearing required by the statute is thus postponed until the time the railroad moves for approval of the acquisition itself and for dissolution of the voting trust. As for the issue of competition, the procedure adopted by the Commission drains the Act's prohibition of whatever meaning may be left in the wake of its method of dealing with the term "interest."[7]
 
 
 96
 The Commission's error here was particularly egregious because it made its determination that "CSX has no prohibited interest in a water carrier"[8] on the basis of an abstract examination of voting trusts in general. Although implicitly recognizing that, depending upon the facts, a voting trust could be so structured that it would be a prohibited "interest" within the meaning of the statute, the Commission expressly refused to examine[9] whether the requisite facts existed here.[10] The Commission also recognized that, in addition to ownership by CSX of the voting trust certificate, relationships might exist between CSX and ACBL which could constitute a prohibited "interest," but, again, it declined either to examine into the nature of any such relationships or to make findings with respect thereto. ICC Decision at 8-9.[11]
 
 
 97
 In short, when the Commission refused to interfere with the merger on the ground that CSX "has no prohibited interest" in ACBL (ICC Decision at 1), it did not know--and it does not now know--whether CSX has, in fact, acquired such an interest. All it relied on was its assumption that a typical or average voting trust is not the kind of interest prohibited by section 11321. As indicated in Part II infra, that conclusion, too, was incorrect. But even if the ICC was right regarding voting trusts in the abstract, it could not justifiably hold that the acquisition by CSX of this particular voting trust certificate--the one that the petitioner complains about and the one that is before this Court--does not violate the statute. Whatever deference is ordinarily due to decisions of regulatory agencies (Maj. Op. at 591), it does not, it seems [230 U.S.App.D.C. 124] to me, extend to so irrational a determination.[12]
 
 II
 
 98
 This basic procedural irregularity is sufficient, in my judgment, to require a reversal of the Commission's decision. However, the Commission also erred substantively in finding that the voting trust would not give CSX an "interest" in ACBL.[13]
 
 
 99
 Unlike 49 U.S.C. § 11343, the general provision applicable to carrier acquisitions which prohibits only the unauthorized acquisition of control or management powers[14] over other common carriers, the Panama Canal Act provides that
 
 
 100
 [n]otwithstanding section 11343 ... a [rail] carrier ... may not own, operate, control, or have an interest in a water common carrier ... with which it does or may compete for traffic.
 
 
 101
 The Commission regards the addition of the term "interest" as having so little significance that it treats "interest" and "control" as essentially interchangeable, and the term "interest" for practical purposes as mere surplusage. Thus, in its decision, the Commission stated that
 
 
 102
 the provisions of section 11321 are [not] sufficiently different from those of section 11343, so that voting trusts, and the body of law developed around voting trusts, cannot operate in the same manner under the two provisions.
 
 
 103
 ICC Decision at 8-9. In its brief, the agency similarly dismisses the fact of the inclusion by the Congress of the term "interest" in the Panama Canal Act as being nothing more than "slightly different words." Brief of ICC at 19 note 4.
 
 
 104
 The Commission did not take so cavalier a view of the statutory pattern in the past. In Investigation of Seatrain Lines, Inc., 206 I.C.C. 328, 333 (1935), it flatly stated that a rail carrier is forbidden to have "any interest [in a water carrier] and the prohibition is absolute" (emphasis in original), and it rejected as too narrow a construction of "interest" "as meaning [only] such an interest as enables a railroad to control or exercise direct influence over the activities and policies of the water carrier." 206 I.C.C. at 333. The Commission's present construction is directly to the contrary. ICC Decision at 4. Likewise, in Nicholson Universal Steamship Company Ownership, 248 I.C.C. 43, 64 (1941), the Commission observed that a railroad need not obtain control of a water carrier to acquire a prohibited interest. With respect more specifically to a voting trust, the Commission implicitly held that such an arrangement was "not sufficient to avoid a violation" of the "interest" clause (28 I.C.C. at 63-66), and it further emphasized that the Panama Canal Act "was meant to bring about a complete divorcement of any railroad interest in [water carriers]."[15]
 
 
 105
 Joseph Eastman, the then chairman of the Commission, placed the issue in its proper perspective, when he stated in a concurrence in Nicholson, 248 I.C.C. at 67-68:
 
 
 106
 [T]his provision [section 11321[ (a) ] prohibits, not only "control," but also "any interest whatsoever," and ... both are [230 U.S.App.D.C. 125] clarified by the parenthetical clause containing such broad words as "or otherwise," indirectly, and "in any other manner." [See note 5 supra ].... I well remember the passage of the Panama Canal Act, and entertain no doubt that the prohibition ... was motivated by a desire to enforce a complete separation between railroads and competing water carriers. Practical experience ... had shown the legal difficulties attendant upon proof of "control" of one company by another.... Because of these difficulties, I think it is plain that the authors of this prohibition intended to, and did, use language so broad and comprehensive that all such obstacles to the enforcement of the complete separation which they desired would be overcome. The words "any interest whatsoever" are far from being ... mere surplusage.... They embrace interests which do not necessarily carry with them "control."[16]
 
 
 107
 The Commission, and the majority here, rely to the contrary on Illinois Central Railroad Co.-Control-John I. Hay Co., 317 I.C.C. 39 (1962) and on Chicago, Milwaukee, St. Paul & Pacific Railroad Co. Control, Bremerton Freight Car Ferry, Inc., 312 I.C.C. 553 (1961).
 
 
 108
 In both of these cases the Commission held hearings on proposed acquisitions, ultimately disapproving the rail-water acquisition in Illinois Central and approving it in Chicago, Milwaukee. The proposed transactions had been placed before the I.C.C. through purchase contracts the execution of which had been made subject to I.C.C. approval. In neither case was the purchase contract itself challenged as an interest, and the I.C.C. did not address this question. Beyond that, the important point with respect to these cases is that a hearing occurred in both cases before the rail carrier acquired the stock of the water carrier. There is no language in either decision, moreover, comparable to that employed by the ICC here, to overrule the Nicholson-Seatrain principle that the "interest" language in section 11321 is broader than the "control" language in section 11343.
 
 
 109
 In short, the Commission's evident view--that "interest" means little more than "control"[17]--is simply wrong.[18]
 
 
 110
 The Court considers that a purchase contract is not an "interest" within the meaning of the statute, and that for that reason it is likely that a voting trust is in the same category. Maj. Op. at 591-593.[19] The majority's premise does not seem to me to be as firmly established as it evidently assumes. As indicated above, in the two prior cases in which purchase contracts have been used, the issue was not contested, briefed, or decided. Additionally, under the language of the Nicholson or Seatrain decisions supra, purchase contracts are prohibited interests.[20]
 
 
 111
 But even if it be assumed, arguendo, that a purchase contract between a rail and a water carrier is a permissible device, the result would be no different. A voting trust is not like a purchase contract. In addition to the many formalistic differences, there is the basic fact that under a purchase contract profits flow to the seller, while in a voting trust situation they inure [230 U.S.App.D.C. 126] to the benefit of the purchaser. Substantial consequences follow from this factor.[21] Additionally, executory contracts are far less stable and more easily voided or breached than voting trusts, and significant consequences may be expected to flow from that difference, too, including an increase in the likelihood that the injuries listed in note 24 infra will occur.[22]
 
 
 112
 Finally, even if the majority is correct in its twin conclusions that a purchase contract is not an impermissible interest under the statute and that the step between such a contract and a voting trust is not large, the question at issue in this case remains unanswered. The majority compares a purchase contract with a voting trust; it does not compare a purchase contract with this voting trust; nor does it compare a purchase contract with this voting trust plus whatever other relationships may exist between CSX and Texas Gas or ACBL. It does not make these comparisons because it cannot, the ICC having explicitly refused to consider anything other than the concept of a voting trust in the abstract.
 
 
 113
 For these reasons, I would conclude that the Commission erred in endorsing the voting trust arrangement between CSX and ACL as satisfying the Panama Canal Act.
 
 III
 
 114
 The Court does not affirm the Commission's decision that the voting trust is not a prohibited interest but upholds the voting trust arrangement on the basis that it is only an "interim device." Maj. Op. at 585 note 10. In so doing, the Court appears to be holding that the present arrangement between CSX and Texas Gas is acceptable only, or primarily, because (1) at some time in the future there will be an opportunity for the ICC to examine the transaction (Maj. Op. at 593-594), and (2) to do otherwise would make it difficult, if not impossible, as a matter of the market realities, for railroads to acquire water carriers. Maj. Op. at 593.
 
 
 115
 There are several problems with the interim arrangement-future hearing rationale.
 
 
 116
 First. Although CSX committed itself at oral argument to apply for dissolution of the voting trust and approval of the transaction within 90 days, ICC proceedings typically take a long time to bring to a conclusion. See Maj. Op. at 582. Thus, for months, if not years,[23] ACBL will be operated under an "interim" voting trust arrangement even though, by the Court's own reasoning, a voting trust not limited in time would constitute a prohibited interest.
 
 
 117
 Second. The Panama Canal Act directs that the Commission's hearing and its action on the transaction occur before consummation of the transaction, not many months later. Again, if a voting trust is or may be an "interest" within the meaning of the Act, then under the statute it could not be created as a tool for the acquisition of a water carrier by a railroad in advance of ICC consideration. This is not a mere technical defect. A railroad acquiring an interest in a water carrier has the incentive and ability to inflict significant injury during the interim period.[24]
 
 
 118
 [230 U.S.App.D.C. 127] Third. Ownership of the voting trust will never be the subject of the "full hearing" the Congress intended. The Commission has declined to hold a hearing on this subject now, and the hearing it will presumably hold eventually will concern only the dissolution of the voting trust and its replacement by CSX's permanent acquisition of ACL--not the validity of the voting trust.
 
 
 119
 Fourth. On the Court's rationale, one could conceivably justify an interim departure from the strict statutory standard if the danger to competition were extremely remote. That is hardly the case here. Interim approval of the CSX takeover in this regard may be analogized to the kind of relief that courts sometimes grant in the preliminary injunction context. One of the factors to be considered in that connection is the likelihood of success on the merits.
 
 
 120
 The Panama Canal Act forbids an acquisition where the railroad "does or may compete." Petitioner WTA supplied the Court with maps which indicate that on a large number of routes in the Midwest CSX and ACBL provide directly parallel service (e.g., St. Louis to Cairo, New Orleans to Tallahassee, Memphis to Louisville). It also appears that coal is the most important commodity carried by CSX and ACBL alike. These facts, to be sure, do not conclusively prove that the merger of the companies will damage competition--no such determination can be made in view of the ICC's refusal to consider the competition issue at this juncture (see note 7 supra )--but they do suggest that the likelihood of a finding of no injury to competition is exceedingly small. See Union Mechling Corp. v. United States, 566 F.2d 722, 729 (D.C.Cir.1977) (Opinion of Robinson, J.) (rail and water carriers compete if they service two or more points in common unless the prospect of competition is "clearly chimerical"). It makes little sense to allow CSX to acquire this water carrier on an interim basis if there is a substantial likelihood that this acquisition must subsequently be undone. See Gulf & Western Industries, Inc. v. Great A & P Tea Co., 476 F.2d 687, 692-93 (2d Cir.1973).[25]
 
 
 121
 Fifth. It may confidently be expected that if, by means of the establishment of a voting trust, this very large merger is allowed to take place without a prior hearing, the same procedure will successfully be used in every future corporate takeover of a water carrier by a railroad. Thus, under the procedure sanctioned by the Court, all hearings (if any) will be future hearings, and the statutory requirement for a hearing in advance of Commission action will become a dead letter.[26]
 
 
 122
 For these reasons, I cannot agree with the Court's conclusion that the requirement of a prior hearing established by section 11321(c) may safely be disregarded on the theory that a hearing will be held eventually.
 
 
 123
 The majority's second, and more basic rationale is that in the world of corporate takeovers tender offers must be consummated within a matter of days or they will lapse and that the prior hearing requirement should be dispensed with in light of that reality.
 
 
 124
 Mechanisms for acquisition other than tender offers do exist. For example, it appears that CSX negotiated with Texas Gas for almost an entire year before the tender offer was made, and it should have [230 U.S.App.D.C. 128] been possible for the parties during that period to arrive at a mechanism, such as an ICC approval in principle,[27] for the acquisition of control of the water carrier which does not violate the statute.[28] Even if no such mechanism could have been found, the alternative of an acquisition of Texas Gas by CSX without the ten percent interest represented by the ACBL affiliate would have been available.
 
 
 125
 To be sure, these alternatives may be less efficient than acquisitions by means of tender offers. It does not follow, however, that the transaction should be allowed to proceed. Under the statute, the Commission has little discretion. It is not under an obligation merely to "consider" the public interest, as in the Tunney Act,[29] before acquiescing in a water carrier acquisition by a railroad, nor is it charged merely with the duty of evaluating the transaction under the broad Clayton Act standard whether the merger would have the effect of "substantially lessen[ing] competition."[30] Unlike these more general, flexible laws, the Panama Canal Act flatly prohibits acquisitions of water carriers by railroads, and it allows an exception only in carefully limited circumstances.
 
 
 126
 The majority speculates that, unless the ICC decision is upheld,[31] it "would force railroads to use less desirable alternative means if they could, and foreclose acquisition entirely if it could not be made by purchase contract...." Maj. Op. at 589-590. That is by no means certain (see p. 587 supra ). What seems to me to be far more certain is that if the third largest railroad is permitted to acquire the largest inland water carrier without a prior hearing, there will never be an acquisition preceded by a hearing; the escape clause will have swallowed up the basic prohibition; and the Panama Canal Act's careful structure will have been eviscerated.
 
 
 127
 In the end, a choice may have to be made among the various objectives that may be imputed to the Congress. The majority is concerned about the practical difficulties railroads may encounter in acquiring water carriers if "interest" is given its natural meaning and if a hearing is required in advance, and it suggests that this might complicate achievement of the legislative objective of allowing some takeovers. Maj. Op. at 591, 593. But plainly the dominant congressional purpose is embodied in the prohibition against the acquisition of a water carrier by a competing rail carrier. [230 U.S.App.D.C. 129] It seems to me that, if in the process of statutory construction one purpose or the other must be given preference, the general prohibition should be preferred over the limited escape clause.[32]
 
 
 128
 The public interest will not be injured if railroads are encouraged to attempt to devise alternative mechanisms to acquire water carriers, even if these mechanisms may be more cumbersome or time-consuming than the tender offers which have found so much favor in recent years. When Congress enacted the Panama Canal Act it seems to have faced with equanimity the possibility that some, or many, attempted rail-water acquisitions would not be consummated. It has not been demonstrated that the take-over of water carriers by railroads is so vital an objective that exceptional efforts should be made so to interpret the governing statute as to allow the takeovers to occur without the prior inquiry and the prior findings which the statute mandates.[33]
 
 IV
 
 129
 The statute prohibits a railroad from acquiring an interest in a water carrier; by any ordinary understanding of that term, a voting trust is an "interest"; yet the Commission has determined that it is not;[34] and the majority of this Court has held that, even if it is, the relationship may be consummated on an interim basis. The statute, by any ordinary understanding of its language, prescribes that before the Commission may allow a railroad to acquire an interest in a water carrier it must hold a hearing; it is clear that Congress meant the hearing to precede the decision; yet the Commission has not held a hearing; and the majority of the Court has decided that a prior hearing is not necessary. The statute explicitly prescribes that a railroad may not acquire a water carrier with which it "does or may" compete for traffic; coal is the most important commodity carried by both companies and they serve the same areas of the country; yet the Commission has permitted the current transaction to proceed without even making inquiry into the competition question, evidently on the assumption that, notwithstanding a strong likelihood of an adverse effect on competition, it will ultimately allow the merger; and the [230 U.S.App.D.C. 130] majority of the Court permits the Commission to proceed in its course.[35] I believe that the explanations provided for these deviations from what appear to be perfectly sensible and straightforward congressional directions are not persuasive, and accordingly, I respectfully dissent.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 See B.F. Goodrich Co. v. Northwest Indus., 303 F.Supp. 53, 58-61 (D.Del.1969), aff'd without reaching this issue, 424 F.2d 1349, 1357 (3d Cir.), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970); Illinois Cent. R.R. v. United States, 263 F.Supp. 421, 424 (N.D.Ill.1966) (3-judge court), aff'd mem., 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509 (1967)
 
 
 [2]
 Ch. 390, 37 Stat. 560, 566-67 (1912)
 
 
 [3]
 The only cases we are aware of where a rail carrier has sought ICC approval for its plan to acquire a water carrier are Illinois Cent. R.R.--Control--John I. Hay Co., 317 I.C.C. 39 (1962) (parties executed purchase contract contingent on ICC approval under §§ 11,343 and 11,321) and Chicago, Milwaukee, St. Paul & Pac. R.R. Control, Bremerton Freight Car Ferry, Inc., 312 I.C.C. 553 (1961) (same). Cf. Investigation of Seatrain Lines, 206 I.C.C. 328 (1935) (railroad acquired minority interest in a newly formed water carrier and requested ICC approval for continued ownership)
 See also Ohio Barge Line Control, 250 I.C.C. 56, 61 (1941) (steel company that owned railroad acquired barge line and claimed it did not need to apply for ICC approval under the Canal Act because barge line did not compete with railroad; issue of competition not decided); Warrier & Gulf Navigation Co. Control, 250 I.C.C. 26, 31 (1941) (same); Nicholson Universal S.S. Co. (Interest of N.Y. Cent. R.R.), 248 I.C.C. 43 (1941) (railroad covertly controlled water carrier without seeking ICC approval).
 
 
 [4]
 Voting Trust Agreement between Texas Gas Transmission Corp. and Midlantic Nat'l Bank p 4 (June 13, 1983), reprinted in Petitioner's Appendix ("App.") item C, at 3
 Technically, the entity placed in trust was a Texas Gas subsidiary called American Commercial Lines, Inc., which in turn wholly owns American Commercial Barge Lines, Inc. We use the latter name to refer to both subsidiaries.
 
 
 [5]
 Letter from Texas Gas and CSX to ICC, June 10, 1983, at 1, App. item B, at 1. At oral argument, counsel for CSX reiterated CSX's commitment to apply promptly for ICC approval of the transaction, and stated that 60 to 90 days would be a reasonable time within which to prepare an application. We expect CSX to apply for ICC approval of its takeover of American Commercial Barge Lines, under both 49 U.S.C. § 11,343 and id. § 11,321, within 90 days after CSX acquires Texas Gas' stock
 
 
 [6]
 Voting Trust Agreement, supra note 4, p 7(c), App. item C, at 7-8; see Letter from Texas Gas to ICC, June 14, 1983, App. item D (describing changes in the trust agreement). Thus, the dissent is mistaken in its assumption that the Commission "made its determination ... on the basis of an abstract examination of voting trusts in general." The record shows that the Commission staff reviewed and required modifications to this voting trust in particular
 
 
 [7]
 Letter from Louis Gitomer, Deputy Director, ICC Rail Section, to Eugene Gulland, Attorney for Texas Gas, June 20, 1983, App. item E (emphasis added)
 
 
 [8]
 Petition of Water Transp. Ass'n for a Declaratory Order Pertaining to Voting Trust Agreement Filed by Texas Gas Resources and CSX Corp., App. item F
 
 
 [9]
 WTA asked the ICC to enjoin the merger of CSX and Texas Gas. Motion of Water Transp. Ass'n for an Order Enjoining CSX Corp. from Violating the Interstate Commerce Act and Staying its Acquisition of Shares of Stock of Texas Gas Resources Corp., App. item I. The ICC, however, has no power to enjoin anything, and must go to district court to seek an injunction if it decides that injunctive relief is appropriate. See 49 U.S.C. § 11, 702(a)(3) ("The Interstate Commerce Commission may bring a civil action ... to enforce an order of the Commission ... when it is violated by a [rail] carrier ...."). We think WTA's technical misstep in asking more than the ICC could give is not significant for purposes of the present case. If the ICC had reached the question of appropriate remedy, it presumably would have understood WTA to petition for appropriate steps to prevent the merger--i.e., an ICC order stating that the merger was unlawful and an attempt to enforce that order in district court
 
 
 [10]
 We have discussed in text those aspects of the ICC's decision which we find persuasive. Some of the reasoning in the opinion suggests that an independent voting trust is valid under § 11,321 even if not limited to the time period needed to obtain an ICC decision under § 11,321. See, e.g., ICC Decision at 5 ("the holding of an independent voting trust certificate, standing alone, is not the type of interest prohibited by section 11321"); id. at 7 ("the test of whether an interest is prohibited by section 11321 is whether the relationship enables the railroad to adversely affect competition from water carriers")
 This language is dicta, since CSX had committed to apply promptly for ICC approval. See note 5 supra and accompanying text. It is also inconsistent with our rationale for affirming the ICC's decision. See notes 28-30 infra and accompanying text. We uphold the voting trust only as an interim device to permit the ICC to hold a hearing and decide whether the two carriers compete and, if so, whether a permanent relationship between the two carriers is in the public interest and will not reduce competition.
 
 
 [11]
 Order, Water Transp. Ass'n v. CSX Corp. (July 8, 1983) (Judges Wright and MacKinnon; Judge Scalia dissenting)
 
 
 [12]
 The Association also argues that even if voting trust ownership is not per se a violation, the ICC's voting trust guidelines do not adequately insulate the barge line from control by CSX. This challenge can be quickly dismissed. In developing the voting trust guidelines, the ICC proposed complex and rigorous rules to eliminate any possibility of abuse of the trust. It decided instead to adopt weaker guidelines (plus a procedure for informal agency review of trust agreements) so as not to "burden the transportation industry with complex voting trust regulations to combat abuses by a small number of individuals in very limited circumstances." 44 Fed.Reg. 59,909 (1979). The Commission also announced its intent "to monitor closely the continued use of these devices and to take whatever action is necessary, including forced divestiture of stock, in those instances where a voting trust agreement has been improperly used." Id. In short, the ICC considered and found acceptable the risk of abuse of a voting trust
 It is not enough, then, for WTA to show that a voting trust that meets the guidelines--as the CSX trust does--would permit an overreaching rail carrier to influence the trust-held water carrier. Rather, WTA must show that the ICC's decision to accept some risk of abuse in return for the benefit of less burdensome regulation was arbitrary and capricious. We do not think it is. The ICC considered the relevant factors, and WTA does not seriously attack the Commission's balancing of the costs of additional regulation against the costs of minimal guidelines.
 
 
 [13]
 See H.R.Rep. No. 423, 62d Cong., 2d Sess. 12 (1912); Lake Line Applications Under Panama Canal Act, 33 I.C.C. 699, 716 (1915)
 
 
 [14]
 See, e.g., 48 Cong.Rec. 11,058 (1912) (statement of Sen. Simmons) ("some inconvenience to the rail carriers in divesting themselves of their property in water transportation is to be expected"); id. at 11,056 (statement of Sen. Brandegee) (Congress wants rail carriers "to divest themselves of attempting to do any transportation by water"); id. at 10,458 (statement of Sen. Smith) (there should be "careful provision made as to the time and manner of enforcing such a provision against companies with established business"); id. at 6928 (statement of Rep. Malby) (railroads will be "obliged ... to dispose of their ... steamboat lines")
 
 
 [15]
 See, e.g., id. at 11,217 (statement of Rep. Covington) (Act forbids a railroad "to own, operate, or control in any manner any water carrier with which it may compete"); id. at 11,205 (statement of Rep. Sims) (bill "prevents railroad ownership of water carriers operated ... in competition with their rail lines"); id. at 11,063 (statement of Sen. Bristow) (bill "forbid[s] railroads from owning such competing steamship lines"); id. at 11,058 (statement of Sen. Simmons) ("railroads shall not be permitted to own water carriers in competition with them"); id. at 6595 (statement of Rep. Knowland) (bill "prevent[s] any control, directly or indirectly"). See also Letter from C.A. Prouty, ICC Chairman, to President Taft (Mar. 12, 1912), reprinted in 48 Cong.Rec. 10,463 (1912) ("it is absolutely essential that rail carriers be prohibited from owning or controlling, directly or indirectly, competing water carriers")
 
 
 [16]
 See, e.g., 48 Cong.Rec. 6568 (1912) (statement of Rep. Broussard) (Act addresses "whether steamships owned in whole or in part by railroad companies shall be permitted to use the canal"); id. at 6595 (interchange between Rep. Hardy and Rep. Knowland) (quoted in note 17 infra )
 
 
 [17]
 See id. at 6594-95:
 Mr. HARDY.... You prevent a railroad company from owning stock in a water line, but you do not prevent the same stockholders that own stock in a railway company from owning stock in a water line.
 Mr. KNOWLAND. We prevent any control, directly or indirectly; and I think that would cover it ....
 ....
 Mr. HARDY. Just one moment. I do not think that a railroad company would be owning an interest in a ship line because one of its stockholders owned an interest in a ship line ... because the railroad does not own what its stockholders own.
 Mr. KNOWLAND. I hope the gentleman will give that careful study and correct it if he can.
 
 
 [18]
 Transportation Act of 1940, ch. 722, 54 Stat. 898
 
 
 [19]
 See S.Rep. No. 433, 76th Cong., 1st Sess. 1 (1939) ("With one-third of the railroad mileage already in bankruptcy ... and with another third tottering on the verge of bankruptcy, action must be taken to preserve not only the railroads but an adequate transportation system for this country."); id. Part II (Minority Views), at 2 ("Where has the demand for regulation [of water carriers] come from? It comes from the railroads.")
 
 
 [20]
 Transportation Act of 1940, supra note 18, sec. 7, § 5(14)-(16), 54 Stat. at 909-10; see H.R.Rep. No. 2832 (Conf.Rep.), 76th Cong., 3d Sess. 69 (1940):
 The so-called Panama Canal Act provisions ... have been modified for the purpose of ... making more certain the authority of the Commission, in connection with which there has apparently been doubt, with respect to installation of new service.
 See also 86 Cong.Rec. 10,175 (1940) (statement of Rep. Lea, House floor manager for the Act) (approving the ICC's reasoning in Southern Pacific ); id. at 11,271 (statement of Sen. Clark) (complaining that Congress was endorsing the ICC's Seatrain Lines opinion); id. at 11,285 (statement of Sen. Wheeler) ("the decisions of the Interstate Commerce Commission were in exact accord with the intent of Congress").
 
 
 [21]
 The only indication in the extensive debate over the amendments that a railroad must obtain prior approval is a few scattered comments that suggest that the congressmen who made them may have assumed that a railroad would obtain approval first and acquire a water carrier afterwards. See 85 Cong.Rec. 11,612 (1940) (question by Sen. Clark) (inquiring whether the bill "empowers the Interstate Commerce Commission to authorize railroads to acquire [competing water] lines"); id. at 11,613 (response by Sen. Reed) (a railroad with a terminal at Duluth could "operate boat lines to Buffalo, if [it] could secure permission for the Interstate Commerce Commission to do so"); id. (statement of Sen. Taft) ("under the proposed legislation the Interstate Commerce Commission is given power to authorize a railroad to acquire a competing water service")
 
 
 [22]
 Pub.L. No. 94-210, 90 Stat. 31 (1976) (current version in scattered sections of 45, 49 U.S.C.)
 
 
 [23]
 Pub.L. No. 96-448, 94 Stat. 1895 (1980) (amending 49 U.S.C. §§ 10,101-11,917)
 
 
 [24]
 Congress also provided in the Staggers Act, somewhat obliquely:
 With respect to the relationship between water carriers and rail carriers, none of the amendments made by this Act shall be construed to make lawful ... any competitive practice that is unfair, destructive, predatory, or otherwise undermines competition ....
 Id. § 707, 94 Stat. at 1965-66 (codified at 49 U.S.C. § 10,706 note). This provision was apparently designed to alleviate concern that the railroads might use their new rate-setting freedom to set predatory rates that would drive water carriers out of business. See H.R.Rep. No. 1430 (Conf.Rep.), 96th Cong., 2d Sess. 143 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News 3978, 4110, 4175:
 The intent is that none of the amendments made by this Act is to be used to legitimize the undermining of rail-water competition. Railroad rates and practices that ... are unfair, destructive, predatory, or otherwise undermine competition ... shall continue to be prohibited.
 The conferees rejected a broader House provision that "none of the amendments made by this Act shall be construed to modify ... existing law with respect to competition and coordination [between rail carriers and water carriers]." H.R. 7235, § 803, reprinted in H.R.Rep. No. 1035, 96th Cong., 2d Sess. 33 (1980).
 
 
 [25]
 In two of the other three cases, Ohio Barge Line Control, 250 I.C.C. 57 (1941), and Warrior & Gulf Navigation Co. Control, 250 I.C.C. 26 (1941), a steel company that already owned a railroad acquired a barge line and applied for ICC approval under the predecessor to § 11,343 (governing carrier mergers generally). In both cases the steel company claimed that the railroad and the barge line did not compete and did not apply either for ICC approval of the acquisition under § 5(16) or even for an ICC determination under § 5(15) whether the railroad and barge line competed. The ICC, without suggesting that the failure to apply was improper, declined to pass on whether the railroad and the barge line competed. See 250 I.C.C. at 61; 250 I.C.C. at 31
 In the fifth case, Nicholson Universal S.S. Co. Ownership (Interest of N.Y. Cent. R.R.), 248 I.C.C. 43 (1941), the Commission, after investigation on its own motion, found that the New York Central Railroad for some time had covertly controlled Nicholson Steamship Co. through a web of director interlocks and a non-independent voting trust. The Commission ordered divestiture. Id. at 66.
 With regard to the import of the language from ICC opinions quoted by the dissent, we would point out that in the only case involving a voting trust, Nicholson Universal S.S. Co. Ownership (Interest of N.Y. Cent. R.R.), 248 I.C.C. 43 (1941), the majority did not hold that a permanent voting trust was per se a forbidden "interest." Instead, it found that the New York Central's permanent trust conferred an "interest" only after concluding that the trust conferred the power to control. See id. at 63-64. This narrow analysis was no accident, for Chairman Eastman expressed his separate view that the existence of control was "not of prime importance" because the voting trust necessarily conferred an "interest" in the water carrier. Id. at 68 (Eastman, Chmn., concurring).
 
 
 [26]
 The ICC decision in this case bears appropriate indicia warranting judicial deference. The ICC, which Congress has given exclusive jurisdiction to approve or disapprove carrier mergers, see 49 U.S.C. § 11,341(a), is "precisely the type of agency to which deference should presumptively be afforded." Federal Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 37, 102 S.Ct. 38, 44-45, 70 L.Ed.2d 23 (1981). Moreover, the ICC has fully explained its reasons, has reached a result consistent with its past decisions, see ICC Decision at 4-5 (distinguishing prior cases as involving either control or a permanent interest) and has relied on policy considerations rather than "narrow dissection of the language of the Act." National Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 169 (D.C.Cir.1982)
 
 
 [27]
 We reject this alternative. The ICC's actions in the present case reflect its view that prior approval is needed for this acquisition, and we find that interpretation a reasonable one in light of the statutory language and history
 
 
 [28]
 John Hay and Bremerton Ferry can also be taken to implicitly hold that a purchase contract, even if it is an "interest" within the meaning of the Canal Act, is one that can be acquired pending ICC approval of a more substantial interest. The argument that a railroad can acquire a minimal interest without prior ICC approval is in some ways more attractive than the argument that the phrase "any interest whatsoever"--which sounds absolute--cannot be read that way. It is consistent with Commission precedent, for the Commission has never objected to a party's failure to seek advance approval despite several opportunities to do so. See Ohio Barge Line Control, 250 I.C.C. 57 (1941); Warrior & Gulf Navigation Co. Control, 250 I.C.C. 26 (1941) (both discussed in note 25 supra ); Investigation of Seatrain Lines, 206 I.C.C. 328 (1935) (discussed in subsection A.3 supra ). Moreover, it would do little violence to the statutory scheme. Advance approval would still be required for a controlling interest, under § 11,343 as well as § 11,321, and there seems scant anticompetitive danger from a noncontrolling interest held only for the interim period needed to seek ICC approval
 ICC counsel and CSX both argue that this interpretation of the Canal Act provides an alternate ground for sustaining the Commission's decision. ICC Brief at 10 n. 1; CSX Brief at 25-29. We need not decide that question here, for the ICC chose to rely on a nonliteral interpretation of the term "interest," and we are able to uphold that interpretation. We are, however, surprised that the dissent, while rejecting the Commission's construction that some "interests" may exist while approval is sought, nonetheless readily accepts the proposition that prior approval is required in all cases. See dissenting op. at 601. For, were we to accept the dissent's literal interpretation of the "interest" prohibition, the necessity of giving meaning and effect to the permission provision (which cannot, as discussed in text, realistically be implemented without prior acquisition of some "interest") would seem to require rejection of a prior approval interpretation. The result, of course, would be the same under either formula; WTA's claim for relief must be denied.
 
 
 [29]
 See WTA Brief at 47 (John Hay case "demonstrates how the statute should work")
 
 
 [30]
 WTA concentrates its statutory argument exclusively on the term "interest" in the statutory phrase "own, operate, control, or have an interest in." Intervenor Eastern Coal Traffic Conference raises the alternate possibility that the voting trust is proscribed because CSX will continue to "own" (in an equitable sense) American Commercial Barge Lines. Eastern Coal Traffic Conference Brief at 5
 We think the term "own," like the term "interest," cannot be an absolute. One who holds a contract to purchase (as in John Hay and Bremerton Ferry ) is often called an "equitable" owner, yet, to make the statute work, purchase contracts must be permissible. Ultimately, the precise content of both terms must be assessed on the basis of the purpose they are meant to serve. The critical analytical point is that there must be some minimal leeway in § 11,321(a)(1)'s proscription of ownership or interest, or else the merger authority in § 11,321(b) becomes a dead letter.
 
 
 [31]
 It is necessary to this argument that the voting trust continue for only a short period of time. This condition is satisfied in this case because CSX committed to apply promptly for ICC review of its contemplated merger with American Commercial Barge Lines and the voting trust--at ICC insistence--provides for divestiture should the ICC disapprove the merger. Thus, CSX has only a short-term stake in the barge line's future profits
 WTA and the dissent attempt to distinguish a voting trust from a purchase contract on the basis that in the latter, the water carrier retains the benefit of earnings in the interim period while the ICC is deciding whether to approve the merger. WTA Reply Brief at 22-23; dissenting op. at 9-10. This is only partly correct; if the purchase price is fixed at date of agreement, with no adjustment for earnings between date of agreement and date of closing (Bremerton Ferry involved such an agreement), the rail carrier receives the benefit of interim earnings unless the ICC disapproves the transaction. Moreover, so long as the interim period is short, the railroad's extra stake in interim earnings should not substantially increase its financial stake in or incentive to influence the water carrier's operations.
 
 
 [32]
 In the case of a voting trust, the railroad actually owns the water carrier's stock; thus, it is important that the voting trust ensure the water carrier's independence. As discussed in note 12 supra, we think the ICC's voting trust guidelines (including advance ICC review of the trust agreement), the temporary nature of the voting trust, and ICC authority to remedy any attempted abuse of the trust, suffice in this regard
 
 
 [33]
 See Southern Ry. v. Seaboard Allied Milling Corp., 442 U.S. 444, 452-63, 99 S.Ct. 2388, 2393-98, 60 L.Ed.2d 1017 (1979) (ICC decision not to investigate lawfulness of seasonal rate increase is not reviewable); City of Chicago v. United States, 396 U.S. 162, 165-66, 90 S.Ct. 309, 311, 24 L.Ed.2d 340 (1969) (although ICC decision not to investigate railroad's abandonment of passenger service would have been unreviewable, its written decision after investigation was subject to APA review)
 
 
 [34]
 WTA charges that CSX will acquire, in addition to the voting trust, two other "interests" in American Commercial Barge Lines: interlocking directors and a $20 million debt now owed by the barge line to Texas Gas
 Texas Gas promised to eliminate the director interlocks before CSX acquires any Texas Gas stock and the Commission apparently accepted the promise, for it did not discuss the interlocks in its opinion. We have no basis for doubting this promise; moreover, the voting trust agreement would seem to instruct the trustee to eliminate any interlocks. See text accompanying note 4 supra. Finally, the Commission has ample power to remedy any abuse of the trust, including possibly disapproving the prospective merger.
 As for the $20 million loan, CSX states in its brief that it has been repaid. CSX Brief at 38 n. 1. In view of WTA's failure to bring the loan agreement to the ICC's attention at the time called for under ICC practice, see ICC Decision at 3, and of the substantial probability of mootness, we decline to decide whether, as the ICC stated, a bona fide debtor-creditor relationship is permitted by the Canal Act.
 
 
 [1]
 49 U.S.C. § 11321(b). The ICC must also find that, notwithstanding the interest, the water common carrier will be operated in the public interest
 
 
 [2]
 CSX is the parent company of several railroads, including the Chessie System Railroads and the Seaboard System Railroads. CSX is also the nation's largest rail carrier of coal. It operates from the Great Lakes to the Gulf of Mexico, and from the Mississippi River to the Atlantic Ocean
 
 
 [3]
 See American Waterways Operators, Inc. v. United States, 386 F.Supp. 799, 803 (D.D.C.1974); Lake Line Applications Under Panama Canal Act, 33 I.C.C. 699, 712-14 (1915). The House report on the Panama Canal Act states:
 The evil is prevalent, recognized, and complained of. The proper function of a railroad corporation is to operate trains on its tracks, not to occupy the waters with ships in mock competition with itself, which in reality operate to the extinction of all genuine competition.
 H.R.Rep. No. 423, 62nd Cong., 2d Sess. 12 (1912).
 
 
 [4]
 This is not an ancient law, ill suited to modern conditions. Congress reaffirmed its purpose a number of times, the last time as late as 1980. See section 707 of Public Law No. 96-448, 94 Stat. 1895, 1965-66 (1980); H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 142-43 (1980), reprinted in 1980 U.S.Code Cong. & Adm.News 4110, 4175
 
 
 [5]
 Prior to the 1978 codification of the Act (Pub.L. No. 95-473, 92 Stat. 1342 (1978)), the statute prohibited a railroad from having "any interest whatsoever" in a water carrier. The codification substituted the present wording which, according to the historical and revision note to section 11321, is even more inclusive than the prior language
 
 
 [6]
 I do not understand the Court to hold that the statute does not require a prior hearing. Although that issue is discussed, the majority does not appear to reach a definitive conclusion. Maj.Op. at 586-587, 587-590. In any event, I see no substantial basis, either in the history of the statute or its purpose, for concluding that, contrary to the plain words of the Act, a prior hearing is not required. See also Maj.Op. at 590 note 21
 
 
 [7]
 The Commission believes that the Panama Canal Act would not have been violated even if CSX did acquire a prohibited interest in ACBL, on the theory (1) that a finding of actual or possible competition between the two carriers is a prerequisite to a finding of a violation, but (2) that no such finding can be made until a hearing is held. Notwithstanding this reasoning, the Commission refused to hold a hearing. ICC Brief at 10 note 1
 
 
 [8]
 See Water Transport Association--Petition for Declaratory Order--American Commercial Lines Voting Trust, Finance Docket No. 30,215 at 9 (July 1, 1983) [hereinafter ICC Decision]
 
 
 [9]
 In its brief in this Court, the Commission states:
 WTA challenges the Commission's alleged 'finding' that the specific independent voting trust agreement at issue was adequate. The Commission expressly refused, however, to rule on the adequacy of that agreement.
 Brief of Respondent Interstate Commerce Commission at 29. See also ICC Decision at 9.
 
 
 [10]
 Had it done so, it might have found, inter alia, that the voting trust agreement includes only the ICC-regulated subsidiaries of Texas Gas, excluding unregulated water carriers owned by that corporation; that it does not restrict personal contact and other interaction between CSX and the water carrier affiliates of Texas Gas; and that it does not prohibit unilateral anticompetitive conduct stemming from the awareness of CSX and Texas Gas employees of their relationship. See Petitioner's Brief at 42-46. Since the Commission declined to hold a hearing, and since only five days elapsed between the filing of the WTA petition and the agency decision, neither the accuracy of these charges nor their exhaustiveness is known
 
 
 [11]
 The ICC also declined to place in the record WTA's allegation that CSX and ACL would be able to file consolidated tax returns on the ground that this allegation was raised in a pleading which the Commission regarded as an improper "reply to a reply." ICC Decision at 3-4
 
 
 [12]
 See National Association of Recycling Industries v. ICC, 704 F.2d 638, 639 (D.C.Cir.1983)
 
 
 [13]
 As I read the opinion of the majority of this Court, it refrains from endorsing the Commission's position in this regard. See p. 586 infra. The Department of Justice, named as a respondent, neither supports nor opposes the ICC position
 
 
 [14]
 "Control" is defined as "actual control, legal control, and the power to exercise control, through or by (A) common directors, officers, stockholders, a voting trust, or a holding or investment company, or (B) any other means. 49 U.S.C. § 10102(7)
 
 
 [15]
 248 I.C.C. at 64-65. The Commission attempts to distinguish these precedents on the basis that "they did not present the issue of whether a valid independent voting trust, standing alone, would constitute a prohibited interest under those Acts" (emphasis added). ICC Brief at 21. One of the principal problems with the Commission's decision in this case, of course, is that it has refused to consider whether or not the CSX voting trust stands alone. See pp. 597-598 supra. Beyond that, the Commission explains away the adverse language in prior decisions on the basis that all of it constitutes mere dicta
 
 
 [16]
 See also, 48 Cong.Rec. 6928, 9232, 10458, 11055 (1912)
 
 
 [17]
 That view is evidenced not only by the above-quoted language from the ICC's decision and its brief, and by its failure to identify a single matter with respect to which application of the "interest" statute would lead to a different result, but also by its reflexive application to this case of voting trust guidelines adopted for "control" situations
 
 
 [18]
 Words employed in a statute cannot be presumed to be surplusage. See, e.g., Zeigler Coal Co. v. Kleppe, 536 F.2d 398, 406 (D.C.Cir.1976). That principle is especially valid where, as here, a statute operating with another law in the area of similar, but not identical subject matter uses additional, different, and stronger terminology
 
 
 [19]
 Both the Commission and the Court acknowledge that there is no precedent upholding a voting trust in the section 11321 situation
 
 
 [20]
 In an effort at persuasion, petitioner WTA concedes in its brief that a purchase contract "made sense [in the John I. Hay case] and it could make sense here." Brief at 24. We are, of course, not bound by that observation
 
 
 [21]
 The incentive to manipulate is certainly greater in the latter situation than in the former. It is also noteworthy that the Securities Laws include a voting trust certificate within the meaning of "security," but they say nothing about purchase contracts. 15 U.S.C. § 78c(a)(10). See also, Reserve Life Ins. Co. v. Provident Life Ins. Co., 499 F.2d 715, 724-25 (8th Cir.1974)
 
 
 [22]
 For example, improper collaboration between the employees of the two companies is much more likely if they know that, to all intents and purposes, the transaction is unbreakable. It is also quite improbable that CSX and ACBL will vigorously compete with each other while they are tied together by a voting trust
 
 
 [23]
 By its terms, the voting trust here involved can last for as long as ten years
 
 
 [24]
 Among the possible injuries to competition and competitors are improper collaboration between CSX and barge line employees to the detriment of other water carriers, preferential treatment in rates and service to the rail-owned water carrier at points where water carriers connect with CSX rail lines, and juggling of the barge line's rates to the disadvantage of its competitors. One would have to close one's eyes to the realities to suppose that the water carrier, operating under a voting trust established by CSX, will vigorously compete with CSX. Further, whatever the theoretical retention by the ICC of the power of eventual disapproval, it is unlikely that an acquisition, once having taken place under these circumstances, or having been in operation for many months or many years, will ever be undone. Counsel for the Commission was unable at oral argument to cite an instance where this had occurred
 
 
 [25]
 This will surely happen unless the ICC should at that time again apply its own policy rather than the congressional view of the proper relationships in the rail-water market. See note 31 infra
 
 
 [26]
 Indeed, it may be expected that the decision in this case, since it removes obstacles which some might have thought to exist, will substantially increase railroad interest in water carrier takeovers
 
 
 [27]
 It is suggested that it is the Commission's practice not to grant such approvals. However, not only is it not clear that this is the Commission's practice, but it would seem that, if there is to be any accommodation to what are called the practical realities, it is more appropriate that the Commission's procedures be adjusted rather than the requirements of the statute
 
 
 [28]
 Mergers and acquisitions were not unknown before the tender offer mechanism gained currency in recent years
 
 
 [29]
 15 U.S.C. § 16(e)
 
 
 [30]
 15 U.S.C. § 18
 
 
 [31]
 The majority relies heavily on the ICC's interpretation of the statute. That interpretation is entitled to deference, of course, although less so where clear statutory language is involved and where the agency, by its own admission, has never before considered whether a voting trust is an "interest" within the meaning of § 11321
 Furthermore, the agency has informed the Court that its policy is not to interfere with "the workings of the marketplace" where the law does not "require" its intervention nor "compel[ ] [it] to step in." ICC Decision at 1. It is not inappropriate, I think, to observe that this language is a euphemism for a refusal to enforce the prohibition of the law unless there is no construction, no matter how remote from the congressional purpose, which would permit an escape. If the Commission were committed to a neutral policy of enforcing the statute as written and as it was intended to be applied, it would not have felt a need to state the agency policy in these terms. Whatever may be true in other circumstances, the policy underlying this statute is not to defer to the marketplace where rail and water carriers are involved. The statute directs that railroads shall not--obviously regardless of the workings of the marketplace--acquire such carriers, unless it has first been determined that such takeovers could not harm competition.
 Given that the ICC's interpretation and its policy are at variance with the statutory language and purpose, I would not give it the deference accorded by the majority.
 
 
 [32]
 The general prohibition should certainly prevail over the objective of accommodating the desire of this railroad to acquire this water carrier by the most efficient means available
 
 
 [33]
 The majority suggests that the Commission might have prosecutorial discretion not to enforce the Panama Canal Act prohibition as requested by petitioner. Maj.Op. at 595 note 33. It is difficult to believe that, in view of the unequivocal statutory prohibition, and the exclusive jurisdiction of the ICC with respect to rail and water carriers (49 U.S.C. § 5(11)), see B.F. Goodrich Co. v. Northwest Industries, Inc., 424 F.2d 1349, 1355 (3rd Cir.1970), such discretion exists. See Adams v. Richardson, 480 F.2d 1159, 1151-53 (D.C.Cir.1973). However, even if the Act were interpreted as less than a mandatory enforcement statute, this Court could still find, and in my judgment should find, that the ICC's decision to avoid the mandate of the law in this instance constituted a "patent abuse of discretion." Moog Industries v. FTC, 355 U.S. 411, 414, 78 S.Ct. 377, 380, 2 L.Ed.2d 370 (1958); 2 K. Davis, Administrative Law 229-39 (2d ed. 1979). See also Dunlop v. Bachowski, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); Medical Committee for Human Rights v. SEC, 432 F.2d 659, 673 (D.C.Cir.1972) ("the decisions of this court have never allowed the phrase 'prosecutorial discretion' to be treated as a magical incantation which automatically provides a shield for arbitrariness"). For these reasons, I would remand the case to the Commission with instructions to issue an order stating that the merger is unlawful and, if CSX refused to comply, to seek enforcement of the order in the district court
 In any event, the Commission refused to file an enforcement action, not on discretionary grounds but on its reading of the statute. ICC Decision at 3. If that reading is in error, as I think it is, the appropriate remedy would not be to assume that the agency might have refused enforcement as a matter of discretion or that it would have chosen a remedy, such as a fine, inadequate to this $1 billion transaction, but to remand the case to the Commission for its own decision in that regard.
 
 
 [34]
 See Chairman Eastman's concurrence in Nicholson, supra, 248 I.C.C. at 68, where he stated in regard to an independent voting trust:
 If, in these circumstances, the New York Central does not have 'any interest whatsoever' in Nicholson Universal, then the law has greater power to deprive language of its plain meaning to a layman than I believe it has, even if there be left out of consideration the parenthetical clause ... by which the authors of the prohibition obviously intended to forestall all legal quibbles.
 See note 5 supra.
 
 
 [35]
 The Court quotes Judge Learned Hand's warning against undue reliance on dictionary definitions. Maj.Op. at 591. In this case, the plain words of the statute are, as I have stated, fully supported by the purpose of the Act and its history. Moreover, when, as here, the statutory language is being construed by the agency in so many respects to mean something other than what the words appear plainly to convey, one must wonder both as to the correctness of the interpretation and the basis for the error. The Commission appears to have been led by its zeal for avoiding an interference with "the workings of the marketplace" (ICC Decision at 1) to wrench the language of the law out of its natural shape. See note 31 supra. I do not believe that the principle of deference to administrative construction compels us to acquiesce in the Commission's interpretations